# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 05-80765-CIV-RYSKAMP/VITUNAC

YOUNG APARTMENTS, INC.,

                 Plaintiff,

v.

TOWN OF JUPITER, FLORIDA,
ANDREW D. LUKASIK, and
ROBERT LECKY,

                 Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court upon defendant, Town of Jupiter's, motion for summary judgment **[DE 173]** and statement of undisputed facts **[DE 175]**, both filed on April 28, 2009.  Young Apartments responded **[DE 185]** on May 15, 2009.  Because plaintiff's response to Jupiter's statement of material facts did not comply with the Local Rules, this Court granted plaintiff leave to file a corrected statement of material facts in opposition **[DE 195, 198]**.  The corrected statement of material facts in opposition **[DE 199]** was timely filed on May 28, 2009.  Jupiter replied **[DE 201]** and responded to the amended statement of material facts in opposition **[DE 200]** on May 29, 2009.

Defendants, Andrew D. Lukasik and Robert Lecky, filed a separate summary judgment motion with an incorporated statement of undisputed facts **[DE 177]** on April 30, 2009.  Plaintiff responded **[DE 189]** and filed a separate opposition to the statement of undisputed facts **[DE 188]** on May 18, 2009.  Defendants replied **[DE 193]** on May 26, 2009.

The Court heard oral argument from the parties on July 10, 2009. Accordingly, the motions are now ripe for adjudication.

## I.    Introduction

This case comes before this Court for a second time after consideration by the Eleventh Circuit **[DE 157]**. Initially, this Court dismissed counts II, III, IV, V and VII on defendants' motion to dismiss and denied the remaining claims on summary judgment. The court of appeals reversed this Court and remanded the case in the following respects: (1) to determine "whether Jupiter adopted and enforced the Overcrowding Ordinance with the intent to discriminate against Young Apartments' Hispanic immigrant tenants" as alleged in count I and (2) whether Lukasik and Lecky, in their individual capacities, enforced the Overcrowding Ordinance and initiated the February 24, 2005 condemnation action in violation of the Equal Protection Clause of the Fourteenth Amendment as alleged in count II.

## A.    Young Apartments

Young Apartments, owned 1.7 acres of land containing two buildings located at 1600 Center Street, in Jupiter, Florida. *See* First Am. Compl. **[DE 28]**, at ¶¶ 1, 9. The buildings contain thirty rental housing units and related facilities. *Id.* at ¶ 9. At the time plaintiff purchased the property in March, 2000, the property was in full compliance with the Housing Standards Code of Jupiter and nearly 100% occupied. *Id.* at ¶¶ 8, 11. Plaintiff alleges that shortly after it purchased the property, the Town experienced an increase in its Hispanic immigrant population, fueled by the demand for day laborer jobs in nearby construction projects. *Id.* at ¶ 12. Accordingly, plaintiff's buildings were primarily occupied by Hispanic immigrant workers. *Id.* at ¶ 13.

Plaintiff further alleges that many of the Town's residents were offended by the presence of Hispanic immigrant day laborers who gathered in the Center Street area waiting to be picked up by employers, and that the Town began to "aggressively pursue policies and practices designed to eliminate the perceived problem..." *Id.* at ¶¶ 14, 15. Specifically, plaintiff alleges that the Town implemented practices and policies to eliminate available and affordable housing for Hispanic immigrant workers, including selective code enforcement and the adoption of an over-crowding ordinance (Ordinance No. 6-04). *Id.* at ¶ 15 *et seq*.

Plaintiff claims on January 11, 2005, the Town conducted an unlawful search by forcibly entering the thirty rental units at its property under the guise of conducting an inspection for violations of the Town's over-crowding ordinance, Ordinance No. 6-04. *Id.* at ¶ 56. This ordinance limits the number of occupants living in any housing unit to five individuals, "unless all members are related by blood or marriage." *Id.* at ¶ 32 (citing Jupiter Housing Code, at § 21-206). As a result of the inspections, the Town opened four Code Enforcement Board cases against plaintiff for violations of the over-crowding ordinance, as well as for physical defects on the property resulting from hurricane damage in September, 2004. *Id.* at ¶ 57.

At a meeting on January 21, 2005, the parties negotiated an Agreed Order to avoid demolition of the property. *Id.* at ¶ 60. The Agreed Order provided deadlines for completion of various repairs and the imposition of a fine of $250 per day for each day beyond the final completion deadline of February 18, 2005. *Id.* Plaintiff met two of the three deadlines established by the Town, but was unable to complete roof repairs necessitated by hurricane damage by the February 18, 2005 deadline. *Id.* at ¶ 63. Plaintiff alleges that on February 23, 2005, the Town announced that it would repudiate the Agreed Order and condemn the property.

*Id.* at ¶ 67.  The following day, the Town's building officials condemned the fourteen units under repair and ordered that the units be vacated immediately.  *Id.* at ¶ 70.  Plaintiff contends that as a result of the condemnation of the property and the other allegedly discriminatory actions by the Town, plaintiff sustained substantial financial losses.  *Id.* at ¶¶ 53, 72.

Plaintiffs allege that citizen and official comments at a Town Council meeting on April 5, 2005, after enforcement of the ordinance began, show that the ordinance was targeted at Hispanic Center Street residents and at the owners of the properties at Center Street.  *Id*. at ¶¶ 66.  On remand, two causes of action are at issue.  Both concern violations of the Fourteenth Amendment.

## II.     Discussion

## A.     Standard of Review

A  party is entitled to summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment should be entered only when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party.  *See Sweat v. Miller Brewing Co.,* 708 F.2d 655 (11th Cir. 1983). Summary judgment is mandated when a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, the Court must construe all facts and draw all reasonable inferences in favor of the non-moving party. *HCA Health Services of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir. 2001). The non-moving party bears the burden of coming forward with evidence of each essential element of her claims, such that a reasonable jury could find in his favor. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990). The burden is not a heavy one; however, the non-moving party "[m]ay not rest upon the mere allegations and denials of [its] pleadings, but [its] response ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "It is the obligation of the non-moving party, however, not the Court, to scour the record in search of the evidence that would defeat a motion for summary judgment: Rule 56 'requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Lawrence v. Wal-Mart Stores*, *Inc.,* 236 F. Supp. 2d 1314, 1322 (M.D. Fla. 2002) (quoting *Celotex*, 477 U.S. at 324). Moreover, mere conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment. *See Earley*, 907 F.2d at 1081. The failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. *See Celotex*, 477 U.S. at 322.

B.      **Analysis**

1.      **Relevant Facts**

The parties agree that in 1999, Jupiter developed a "Neighborhood Enhancement

Program" ("Program") to enhance the quality of life and standard of living in four specific older

or "charter" neighborhoods: Pine Gardens North, Pine Gardens South, Eastview Manor and

Jupiter River Estates.  **[DE 173-2]** at 4, 20; **[DE 173-3]** at 3; **[DE 173-7]** at 3.  Each of these

neighborhoods has a concentration of Hispanic residents.  **[DE 173-2]** at 11.  Young Apartments

is located in Eastview manor.  **[DE 173-2]** at 11.

At the same time, Jupiter encountered an increase in its Hispanic migrant population.

Many of these individuals gathered on Center Street to be hired as day laborers.  **[DE 173-2]** at

26.  At the peak, around 400 to 500 day laborers congregated at Center Street to seek

employment on a daily basis.  **[DE 173-2]** at 26.  Testimony reveals that health and safety

problems ensued such as public urination, littering, and congregating in the traffic bearing

portions of the street.  **[DE 173-2, 14]** at 7; **[DE 105-2]** at 15; **[DE 184-5]** at 3 (citizen stating

that laborers would run out into traffic to reach a van for pick-up and would also surround

vehicles not present to hire for day labor).[1]  This impact was not exclusive to Center Street.  Each

of the "charter" neighborhoods were impacted because of overcapacity, primarily because too

many tenants occupied each residence.  **[DE 173-2]** 14.

Part of implementing the Program included the creation of an interdepartmental team

("Team") in 2004.  Created by Lukasik, this Team consisted of various members of Jupiter's

---

[1]The record is replete with citizen comments regarding excessive trash and safety
concerns on Center Street.  The above citations are some examples, but are not an exclusive list.

government such as Frank Melillo, the Code Compliance Supervisor, Andrew Lukasik, the Town Manager, and Robert Lecky, Building Department Director, among others. **[DE 173-2]** at 5; **[DE 173-5]** at 2-3; **[DE 184-9]** at 1; **[DE 184-15]** at 4, 7-8; **[DE 184-16]** at 11-13. This Team proposed Ordinance No. 6-04, enacted on May 4, 2004. **[DE 173-7]** at 4; **[DE 184-17]** at 4, 9; **[DE 173-5]** at 2; **[DE 184-3]** at 6. The purpose of the ordinance was to address unhealthy living conditions in homes and residential buildings, including revising the prior overcrowding ordinance. **[DE 173-7]** at 2-4.[2] The ordinance is based on the International Code Council ("ICC") Standards. The ICC consists of professionals in the building industry and code administrators. The ICC works to establish provisions that "adequately protect public health, safety, and welfare." **[DE 173-9]** at 4. Jupiter found that the code was universally enforced by other jurisdictions. **[DE 173-9]** at 4; **[DE 184-3]** at 6.

One provision of Ordinance No. 6-04 concerns overcrowding, Section 21-254. **[DE 173-9]** at 21-23. At the time of its enactment, Jupiter already had an overcrowding ordinance on the books. Jupiter officials concluded, however, that the existing ordinance lacked "clear standards to define an overcrowded unit" and therefore provided insufficient notice. **[DE 184-3]** at 6.

Debate regarding the new ordinance was extensive. Citizens and counsel members both supported and critiqued the proposed ordinance. Some objections to the ordinance related to

---

[2]Plaintiff argues that the purpose of the ordinance was to address the "day laborer problem." This Court holds that plaintiff took the cited evidence out of context to reach that conclusion. The cited portion of Lukasik's deposition explains that Jupiter exempted children from the overcrowding ordinance to prevent adversely impacting family units and because Jupiter believed that children would not strain the housing units as much as adults. In the line following plaintiff's cited text, Lukasik states "So to address the health, safety, and quality of life issues in the neighborhood, we had to address some of the health, safety, and quality of life issues in the dwelling structures themselves." **[DE 184-16]** at 55.

specific provisions.  For example, some individuals were concerned with whether the ordinance would be enforced against large families and against children.  Others objected to the ordinance because they thought it was too lax, allowing occupancy by too many individuals.  Others argued that the ordinance would not solve all of the problems Jupiter was experiencing from the increased migrant population and that efforts should be directed elsewhere.  **[DE 184-4]** at 11-15.

It was no secret that the increased number of migrant workers negatively impacted some Jupiter communities.  "The problem" to which critics referred was the health, safety and quality of life issues that arose from the the the number of migrants living in these communities and gathering for day labor work at Center Street.  Lukasik recognized that although the overcrowding ordinance would not fix all of the problems associated with the increased migrant population, it would address some.  **[DE 184-4]** at 12.

Taking all of the comments into account, Jupiter incorporated some of the proposed changes and adopted Ordinance No. 6-04.  The new overcrowding ordinance, §21-254, required that no more than five persons occupy any housing unit, unless all members were related by blood or marriage.  Additional occupancy restraints were based on the square footage of the unit versus the number of occupants and the number of bedrooms and bathrooms in a particular dwelling unit.  Children less than eighteen years old were also exempt. **[DE 184-17]** at 66-67.

Jupiter decided to enforce the ordinance through a complaint driven system.  Accordingly, a possible investigation was first triggered by a complaint.  **[DE 184-3]** at 7.  Jupiter officials would ask the complaining party to explain the patterns he observed; for example, how many vehicles, including bicycles, regularly parked at the residence.  **[DE 184-3]** at 7-8.  Once Jupiter received a complaint, inspectors typically conducted surveillance outside the

dwelling to surmise whether there might be a violation.  **[DE 184-17]** at 42.  Then a case number

would be assigned to the complaint.  **[DE 184-17]** at 45.  If it appeared that a violation existed,

the inspection team would meet during early morning hours to inspect residences for

overcrowding.  **[DE 184-17]** at 19-20; **[DE 184-15]** at 65-66; **[DE 184-3]** at 8.  The inspectors

would first seek permission to inspect the property, as this did not require a warrant.  **[DE 184-3]**

at 7.  They would then ask the tenants a number of questions including the name of the person

who leased the property, how many people lived there and whether any children under 18 lived in

the apartment.  **[DE 184-17]** at 21.  Lukasik stated that the intent of the ordinance was to ensure

health and safety.

        A report from the Palm Beach County Department of Housing and Community

Development showed that, according to the census, two target areas in Jupiter had 17.6% of units

overcrowded as opposed to a 4.3% average in the rest of Jupiter.  **[DE 184-4]** at 11. One of these

target areas was Eastview Manor, where Young Apartments is located.[3]  Because many of the

above problems were unique to the charter neighborhoods, Jupiter focused its efforts in those

areas.  **[DE 173-2]** at 20.

        Since enacting the overcrowding ordinance, the inspection has investigated numerous

allegations of overcrowding.  The enforcement actions have been ongoing and Lecky testified

that although current violations of the overcrowding ordinance "ebb and flow," the enforcement

team remains surprisingly active given the amount of public education Jupiter has offered on the

ordinance.  **[DE 184-15]** at 69.

_____

        [3] Counsel for Jupiter testified to this fact at the oral argument on its summary judgment
motion.

**Inspection of Young Apartments**

At some point after Jupiter enacted Ordinance No. 6-04, Jupiter began receiving complaints about Young Apartments.  Tenants of Young Apartments complained to a Hispanic police officer.  Corn Maya, a group advocating Hispanic rights, raised concerns to Jupiter officials.  Finally, numerous citizens anonymously complained about: the Apartment's conditions, the number of people gathering at Center Street in and around the apartments, derogatory remarks to children and young women, public urination, broken windows, and overflowing dumpsters.   **[DE 173-5]** at 3, 5; **[DE 184-6]** at 2; **[DE 184-15]** at 23, 41, 51-52; **[DE 184-17]** at 14-16.   Although Jupiter inspected Young Apartments for building code violations in the past, based on citizen complaints and field observations from Jupiter personnel, Jupiter concluded that the property may not have been properly maintained and scheduled an inspection. **[DE 184-15]** at 29-30.

On January 4, 2005, Keith Murray emailed numerous Jupiter officials to "complain[] about the condition of the rental properties located at 1600 Center Street[;]" Young Apartments. He stated that Young Apartments had "overcrowded, dirty, slum like conditions."  He said on any given day one would find trash, illegal aliens, and a building that appears to be in very poor condition.  He argued that this was "unsafe, unhealthy and not good for the community."  He then asked "[w]hat can the town of Jupiter do to clean up the slums of Center Street?"[4] **[DE 105-**

---

[4]Although Mr. Murray's motive for writing the letter is irrelevant here, he took pains to note that he was not writing the letter to discriminate against anyone based on race or social class. He also specifically stated that his letter was not intended to address illegal immigration. In plaintiff's response, plaintiff mischaracterizes Mr. Murray as "irate" and presents each of the quotes cited from the letter out of context.  **[DE 199]** at ¶ 24.

2]; **[DE 173-5]** at 4.  The prior tenant and citizen complaints, coupled with Mr. Murray's email,

spurred Jupiter's inspection of Young Apartments for overcrowding and building code

violations.  **[DE 173-5]** at 4.[5]

Frank Meillo was in charge of enforcing the ordinances through the established

procedures.  **[DE 184-15]** at 35-36.  Melillo coordinated three teams to inspect Young

Apartments.  **[DE 184-26]** at 3.  All individuals conducting the investigation were to "meet at the

Police Department north entrance @ 06:00."  *Id*.  It was department policy to conduct all

inspections in the early morning so that residents would be home.  **[DE 184-17]** at 19.  Although

the team did investigate the overcrowding complaints, the main purpose for this investigation

was the possible building code violations and not the overcrowding allegations.  **[DE 149-17]** at

49-52.[6]

At 6:30 a.m. on January 11, 2005, the teams began their investigation of Young

Apartments to verify the basic conditions of the building's interior and to determine if the units

were overcrowded.  **[DE 173-5]** at 4; **[DE** 184-17] at 59-60.  A police officer first knocked on a

resident's door, introduced himself and explained that the purpose of the investigation was for

potential building code and possible overcrowding violations.  **[DE 184-23-24]** at 23-24.  The

---

[5] Based on Lecky's response to Mr. Murray, it does appear that a overcrowding and building code inspection of Young Apartments had been scheduled prior to Mr. Murray's e-mail. **[DE 184-15]** at 23-25.

[6] Although plaintiff argues that the purpose of the Young Apartment investigation was to conduct an unconstitutional overcrowding "raid," the evidence shows that Jupiter's primary concern was the possible building code violations.

officer then sought permission to enter the dwelling.[7]  *Id.*  If given permission to enter, the team

took five to ten minutes to measure rooms, ask the residents questions and to otherwise conduct

their inspection.  **[DE 184-17]** at 25-26.

After approximately an hour and a half, the inspection was complete and the teams

returned to write a report to various department heads.  At that time, Jupiter found numerous

building code violations, but did not deem any one particular unit uninhabitable.  **[DE 173-8]** at

15 **[DE 184-17]** 60-62.  There were also limited instances of overcrowding.  This was the only

overcrowding inspection Jupiter ever conducted on Young Apartments **[DE 173-8]** at 14.

Twenty days after the inspection, John White,[8] then owner of Young Apartments, sent a

memo to Jupiter to confirm that he corrected any overcrowding violation.  **[DE 173-5]** at 7.  In

the end, Jupiter did not impose any fines associated with the overcrowding violations through

2009, except for a $135.00 fee to cover inspection costs.  **[DE 173-5]** at 7.  Because White

promptly corrected the overcrowding problems, Jupiter did not pursue any further action.  **[DE

184-17]** at 71-72.  Jupiter believed that the building code violations were more important.

**Development of the El Sol Center**

The increased number of immigrants gathering in the Center Street area began to have an

adverse effect on the community, as explained above.  Jupiter responded by creating the El Sol

center, characterized by Lukasik as the "centerpiece" of the Program.  **[DE 173-2]** at 6.  This was

designed as a place for day laborer pick-up and a resource center for the Hispanic community.

---

[7]Occupants of two dwellings refused to permit the inspectors into the dwelling so no inspections occurred as to those two units.

[8] John White also goes by Jof White.  **[DE 173-8]** at 2.

Implementation of the El Sol center construction was also part of the interdepartmental team's duties.  Although this was a "very politically-charged and pretty divisive controversial strategy" with strong community opinion both for and against creation of the center, Jupiter persevered. **[DE 173-2]** at 8-9, 16-17.

In total, from that time until 2007, Jupiter assisted in spending at least $5,954,875.00 to enhance these charter neighborhoods. **[DE 173-2]** at 18; **[DE 173-3]** at 3.  Jupiter made many infrastructure upgrades such as building new streets, planting medians, creating sidewalks, adding traffic-calming devices, implementing a new street lighting system, and funding a community improvement grant program.  **[DE 173-2]** at 18-19.

## 2.      Jupiter Did not Act with Discriminatory Intent when Enacting 6-04

In count one of the amended complaint, plaintiff alleges that Jupiter created Ordinance No. 6-04 "to target the Property owned by Young Apts. and other properties in the Center Street area, because they afford housing to Hispanic immigrant workers ..."   **[DE 28]**, at ¶ 78.  Plaintiff alleges that Jupiter's purpose, to target only those residences occupied by Hispanics, constitutes invidious discrimination motivated by animus based on race or national origin in violation of the Fourteenth Amendment.  *Id*.

The Eleventh Circuit held that plaintiff has standing, as a non-minority litigant, to allege that it was injured by Jupiter's discriminatory animus towards Hispanic residents.  Since plaintiff sued to recover damages for its own injuries sustained as a result of Jupiter's enactment and enforcement of the Overcrowding Ordinance, plaintiff has standing to challenge the allegedly discriminatory nature of Jupiter's actions.  *Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027, 1037-44 (11th Cir. 2008).

Accordingly, Jupiter has standing to attack the Ordinance as racially discriminatory. "A facially neutral law violates the Equal Protection Clause if adopted with the intent to discriminate against a racial group." *Johnson v. Governor of Florida*, 405 F.3d 1214, 1222 (2005) (en banc) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). A facially neutral statute is unconstitutional if (1) plaintiff can show that "discrimination was a substantial or motivating factor" in the government's enactment of the law, and (2) the government cannot show "that the provision would have been enacted in the absence of any racially discriminatory motive." *Johnson*, 405 F.3d at 1223 (citing *Hunter v. Underwood*, 471 U.S. 222, 227-28 (1985)).

In regard to the first prong, courts must consider circumstantial and direct evidence of intent. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). In considering that evidence, intent can be shown if the law has a disparate impact on one racial group. *Id*. Whether the official action bears more heavily on one race than another, however, is not independently conclusive; courts must also consider evidence such as the historical background behind the state's action and the specific sequence of events in the state's decision making process. *Id*. at 266-68. If plaintiff can establish facts proving that race was a substantial or motivating factor in creating § 21-254, then Jupiter's burden is to prove that the provision would have been enacted even without the racially discriminatory motive. Plaintiff has not provided sufficient facts to prove that racial animus toward Hispanic residents was a substantial or motivating factor in creating, adopting and enforcing Ordinance No. 6-04.

After an exhaustive review of the entire record, including each exhibit filed by the parties, this Court holds that there are no issues of material fact in dispute and that plaintiff has not proven sufficient facts to show that Jupiter's purpose in enacting 6-04 was racially motivated.

As a preliminary matter, it is important to note that there were a number of different issues regarding immigration in Jupiter that all arose during this time.  First, it is undisputed that during the time the ordinance was created, discussed and adopted, there was an increased Hispanic immigrant community living in Jupiter, which impacted the health, safety and welfare of Jupiter residents in multiple ways.  Second, many of Hispanic individuals were living in Jupiter's charter neighborhoods.  Third, many also worked as day laborers gathering at Center Street for work each day.  Fourth, it is also undisputed that there was a concurrent ongoing national debate regarding illegal immigration.

Simply because these issues arose concurrently does not mean that Jupiter was required to address all of these issues simultaneously to protect resident health, welfare and safety.  The mere fact that Jupiter endeavored to address the strains on resident health, welfare and safety via overcrowding first does not prove discriminatory intent.  Nevertheless, Jupiter must not abridge an individual's rights in creating the ordinance.

The evidence indisputably shows that § 21-254 did appear to have a disproportionate impact on Hispanics.  As stated above, however, this alone is insufficient to show discriminatory intent.  This Court must also consider the historical background supporting the act and the specific sequence of events supporting the action.  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977).

First, § 21-254 applied to all of Jupiter.  Second, Jupiter officials recognized that the current overcrowding ordinance was arbitrary, probably unconstitutional, and needed to be revised to include definitive overcrowding guidelines. In doing so, Jupiter officials researched overcrowding ordinances adopted by other cities and settled on the form adopted by the ICC.

This same form has been nearly universally adopted by other cities.  As explained above, the ICC consists of professionals in the building industry and code administrators.  The ICC works to establish provisions that "adequately protect public health, safety, and welfare."  **[DE 173-9]** at 4. Thus, officials adopted an ordinance largely drafted by a neutral body and nearly universally accepted nationwide.

Jupiter also considered comments from citizens and  government officials when enacting § 21-254.  For example, in the original version, there was no exemption for children under the age of eighteen.  Those concerned with adverse effects on large families spoke out, and Jupiter amended the proposed version of § 21-254 to include the exemption.

Third, the record is replete with officials testifying that the purpose of § 21-254 was to promote health and safety in the community.  Lukasik testified that the main purpose of the charter neighborhood program "was to begin to mobilize representatives within the community and identify infrastructure needs of the communities to help bring the quality of life and standard of living for those particular communities up relative to some of the other newly-developed neighborhoods within the town."  **[DE 173-2]** at 4, 10-11 *accord* **[DE 184-15]** at 70 (Lecky testified similarly).  Because the structures in the "charter" neighborhoods were overcrowded, Jupiter "had to address [] the health, safety and quality of life issues in the dwelling structures themselves" to address those same concerns in the neighborhoods.  **[DE 173-2]** at14.  Lukasik further stated that although § 21-254 was titled "overcrowding" it was "really a minimum housing standard."  *Id*.

In testifying about the strong public opposition to the El Sol center, Lukasik recognized that "unfortunately, a quality of life and health and safety issue in our community became

embroiled in a national immigration debate when really all we wanted to do was address how do we make sure that our streets are safe, how do we keep the neighborhoods clean, how do we keep people healthy." **[DE 173-2]** at 17.

This Court's review of the record revealed numerous other statements indicating that Jupiter intended to enact § 21-254 to ensure that all Jupiter residents, regardless of race or location, received accommodations meeting minimum health and safety standards. While a minority of citizens wanted INS involvement and might have been motivated by racial animus towards Hispanics,[9] many more encouraged the speedy enactment of 6-04 to counteract the public health and safety problems and to stop unscrupulous landlords who permitted overcrowding.

Fourth, the fact that Jupiter chose to enforce § 21-254 though a complaint driven system rather than through a general licensing scheme likewise does not show discriminatory intent. Jupiter was attempting to create a system with minimal interference with a landlord's property rights. As such, Jupiter concluded that the most efficient way to enforce the program was thorough a complaint driven system. The fact that the majority of overcrowding in Jupiter occurred in a particular area, the charter neighborhoods, does not alone show action motivated by racial animus. There is simply nothing in the record showing that Jupiter acted with racial animus towards any group when adopting 6-04.

Fifth, there is no evidence that the ordinance acted as a mechanism to remove Hispanics from Jupiter or the charter neighborhoods. Jupiter never sought involvement from any

--------

[9]Although there may have been a few citizens who may have been motivated by racial animus, it does not appear that Jupiter, at any time, was motivated to act because of racial animus.

government body to eject possible illegal immigrants.  Jupiter never sought to otherwise remove individuals from the community.  It appears that Jupiter worked with landlords to address any overcrowding.  White, owner of Young Apartments, was not fined for any overcrowding violation.  It appears that, prior to the inspection, he verbally instructed tenants that overcrowding the residences was prohibited.  As a result of the inspection, he put that policy into writing.  **[DE 184-14]** at 82-84.  Plaintiff also stated that he believed that § 21-254 was directed to the living conditions of the residents and that § 21-254 was in his best interest, because limiting the amount of tenants lessened potential damage wear/tear to his building.  **[DE 184-14]** at 84, 213.[10]

If Jupiter's actions were not motivated by racial animus, there is no constitutional bar preventing it from enacting an ordinance that addresses the health, safety, and welfare of its citizens.  Moreover, it is also a legitimate governmental interest to protect citizen property values.  Jupiter did encounter a number of problems resulting from increased immigration and an increased number of day laborers gathering at Center Street.  Jupiter enacted the overcrowding ordinance to address some of the health and safety problems arising from the overpopulation of the charter neighborhoods and then worked to construct the El Sol center to address the remaining problems.

---

[10] Plaintiff submitted its affidavit in opposition to the motion for summary judgment **[DE 183]**.  This affidavit contradicts the above cited deposition testimony.  This Court holds that the statements made in the affidavit are intended to create issues of material fact. Where a subsequent affidavit is inconsistent with a prior unambiguous deposition, the Court may disregard the affidavit. *Holley Equip. Co. V. Credit Alliance Corp.*, 821 F.2d 1531, 1537 (11th Cir. 1987) (Court found no inconsistency where deponent was correcting his prior testimony). Thus, this Court will not consider paragraphs 12 and 13 of plaintiff's affidavit in this regard.

3.       **Defendants Did Not Selectively Enforce 6-04**

In the same count of the amended complaint, plaintiff also alleges that Jupiter selectively enforced the ordinance against only those dwellings housing Hispanic residents. **[DE 28]** at ¶ 79. Plaintiff alleges that Jupiter only sought to identify properties in the Center Street area that were occupied by Hispanic residents. *Id*.  It then instructed its enforcement officials to use the ordinance only against such properties. *Id*.  Finally, plaintiff alleges that the ordinance was not enforced against similarly situated properties. *Id*.

As such, plaintiff raises a selective enforcement claim under the Equal Protection Clause of the Fourteenth Amendment, cognizable under 42. U.S.C. §1983.  Section 1983 does not create new substantive rights but is merely a vehicle by which a plaintiff may vindicate his preexisting federal rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  A local government can be sued under this section if that government's policy or custom violated a constitutional right; it cannot be held vicariously responsible via *respondeat superior*. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978); *see also Skop v. City of Atlanta*, 485 F.3d 1130, 1145 (11th Cir. 2007).  A city's enforcement of officially promulgated ordinances could establish liability under §1983. *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999).

The Equal Protection Clause mandates that all similarly situated persons be treated alike. *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 , 440 (1985).  If an ordinance is facially neutral, a plaintiff may bring an equal protection claim for its unequal administration if a plaintiff can show that the state engaged in purposeful or intentional discrimination.  To prevail on a selective enforcement claim, plaintiff must show (1) that it was treated differently from other similarly situated entities and (2) that the parties were treated differently because of race or

national origin, among other considerations. *Pisello v. Town of Brookhaven*, 933 F.Supp. 202,

212 (E.D.N.Y. 1996).  If plaintiff can prove both prongs, Jupiter must prove that the law is

necessary to achieve a compelling or overriding government purpose. *Young Apartments, Inc. v.*

*Town of Jupiter, FL*, 529 F.3d 1027, 1046 n.8 (11th Cir. 2008).

 In the initial order granting summary judgment, this Court held that plaintiff was unable

to establish that it was treated differently from other similarly situated entities under plaintiff's

class of one claim. *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1204-05 (11th Cir. 2007) (prong one is

likewise applied for claims based on a suspect classification or on a "class of one" theory).

Plaintiff did not appeal that decision.  Nonetheless, the Eleventh Circuit granted a limited

reversal and remand to permit plaintiff to provide new evidence of Jupiter's alleged

discriminatory motives and to show whether plaintiff was treated differently than landlords of

non-Hispanic tenants. *Young Apartments*, at 1046.  The Eleventh Circuit specifically foreclosed

the reconsideration of "any selective enforcement claims that merely duplicate [plaintiff's] failed

'class of one' unequal enforcement challenge."

 At issue is whether, subject to a suspect classification (race or national origin), Jupiter

selectively enforced the ordinance targeting landlords of Hispanic tenants.  The Eleventh Circuit

required plaintiff to provide new evidence to support its claim.  This Court has reviewed the

entire record and is unable to find new evidence to support plaintiff's claim.  At the hearing, this

Court specifically asked plaintiff to detail the new evidence upon which it relies.  Plaintiff cited

two sources of evidence: (1) the "Overcrowding Investigations" log and (2) overcrowding

complaints from former plaintiff Weston.  Both of those documents were before this Court when

it initially considered this issue.  None of this evidence is directed at establishing that Young

Apartments was similarly situated to another entity that Jupiter knew was overcrowded and that Jupiter failed to investigate or cite.[11]

This same issue goes to any selective enforcement claim plaintiff brings against individual defendants Lukasik and Lecky.  There is nothing in the record that shows that Young Apartments was treated differently from a similarly situated landlord of non-Hispanic tenants. After a careful review of the record, this Court does not find that Jupiter selectively enforced § 21-254 in violation of the Equal Protection clause.

**4.      Lukasik & Lecky are Entitled to Qualified Immunity**

On remand, the Eleventh Circuit has charged this Court with determining whether defendants Lukasik and Lecky, in their individual capacities, violated the Fourteenth Amendment by unlawfully applying and enforcing § 21-254, and whether defendants have a valid qualified immunity defense.

In count two of the complaint, plaintiff argues that Lecky, acting as the Jupiter Building Official in charge of § 21-254, directly participated in the decision to direct the enforcement of

---

[11] There is new testimony from Melillo that 14 of the 218 entries on the overcrowding investigations log were conducted outside of Jupiter's four older or "charter" neighborhoods.  It is undisputed that these four charter neighborhoods have a concentration of Hispanic residents and were the focus of the Neighborhood Enhancement Program.

Even if plaintiff were able to show that it was similarly situated to another entity, plaintiff must prove that Jupiter purposefully or intentionally discriminated against Hispanics because of their race, and that racial animus was the reason behind the alleged selective enforcement of the ordinance.  Plaintiff failed to show this.

As stated previously, a report from the Palm Beach County Department of Housing and Community Development showed that according to the census, two target areas in Jupiter had 17.6% of units overcrowded as opposed to a 4.3% average in the rest of Jupiter.  **[DE 184-4]** at 11. One of these target areas was Eastview Manor, where Young Apartments is located. Simply because a larger percentage of overcrowding occurred in the charter neighborhoods, and because Jupiter focused its enforcement efforts accordingly, does not mean that it enforced the ordinance because of some racial animus against its Hispanic residents.

the ordinance against Center Street properties because those properties rented to Hispanic immigrants.  **[DE 28]**, at ¶¶ 90-91.  Plaintiff argues that Lecky directly participated in the January 11, 2005 early morning inspection of Young Apartments and the arbitrary condemnation of several of those units on February 24, 2005.  *Id*. Plaintiff also argues that Lecky was personally motivated by race and national origin based animus against Hispanic immigrants and therefore targeted these people and their landlords, including Young Apartments, in the creation and enforcement of the § 21-254.  Since this Court has already held that none of the defendants selectively enforced the ordinance, the remainder of the analysis will focus on whether these defendants unlawfully applied the ordinance.

Lukasik was the Jupiter Town Manager during the relevant time.  Plaintiff alleges that he charged Lecky with enforcing § 21-254 and acted as Lecky's direct supervisor.  *Id*. at ¶ 97.  Plaintiff alleges that Lukasik was aware of Lecky's unconstitutional conduct and failed to prevent Lecky from discriminating against Hispanic immigrants and their landlords.  *Id*. at ¶¶ 97-98.

Qualified immunity protects governmental officials from civil liability when performing discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights.  *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).  To establish the defense, a defendant must first show that "the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority."  *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  This is established by showing that the acts were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority.  *Id*. at 1282.  Courts examine the general nature of the action to determine the scope of a defendant's discretionary authority.  *Id*.  Whether the act itself was unconstitutional is irrelevant

for the purposes of this specific inquiry.  *Id* at 1266.  In the response brief, plaintiff concedes that defendants were acting in their discretionary authority.  **[DE 189]** at 3 ("Both individual defendants were acting in their official capacities").

Viewing the facts most favorable to plaintiff, this Court must next determine whether defendants (1) violated plaintiff's federal constitutional or statutory rights and if so, (2) whether those rights were clearly established at the time the government official acted. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Douglas Asphalt Co. v. Asphalt Co. v. Quore, Inc.*, 541 F.3d 1269, 1273 (11th Cir. 2008).  If defendants did not violate plaintiff's constitutional rights, the inquiry ends and the defendants are entitled to qualified immunity.  *Saucier*, at 201.  Plaintiff is correct that this Court must apply the same "'bright line' illegality test" here as it did above in regards to Jupiter's actions.

As stated above, the undisputed evidence shows that neither the town, nor any Jupiter officials acted with racial animus when enacting 6-04 and § 21-254, and that § 21-254 was not selectively enforced against Young Apartments.  Nothing in the record shows that Lecky or Lukasik acted with racial animus at any point in proposing, drafting or enforcing § 21-254.  In fact, the record shows that the defendants' concern for Jupiter's Hispanic population informed their participation in researching, drafting and enforcing 6-04, including § 21-254.  Both individuals worked tirelessly to advocate for the El Sol center.  Both worked with immigrant activist groups, such as Corn Maya, and church groups to ensure immigrant health and safety.

Lukasik and the city attorney created Ordinance No. 6-04.  When creating the ordinance, Lukasik sought advice from numerous groups and individuals.  Such advice culminated, for example, in the exception for children under eighteen years old.  Lukasik testified that the

exception was created because contributors noted that creating a code that did not exempt children "could be a negative impact on large families or a household with many children" and "could be detrimental to those individuals." **[DE 173-2]** at 13.

When asked whether he thought the ordinance should have been enforced before the El Sol center opened, Lukasik responded that although that would have been ideal, he stated that, "my belief at the time was that, you know, we shouldn't be sacrificing the quality of life for anybody in those neighborhoods, everybody should be elevated to a certain standard of living" as "detailed by our minimum housing ordinance." **[DE 173-2]** at 16.  He held this belief even though some constituents argued that the living conditions of Jupiter's Hispanic residents was irrelevant because it was better than the living conditions in their home countries.  **[DE 173-2]** at 16.  Since the El Sol center was built, Lukasik has been playing in the El Sol Hispanic soccer league.  **[DE 173-2]** at 22.

Lecky expressed disappointment that residents were forced to live in apartments that did not meet building code requirements at Young Apartments.  **[DE 184-15]** at 51-52.  He believed it was his responsibility to protect residents from unsafe conditions.  **[DE 184-15]** at 55.  Accordingly, this Court finds that Jupiter, nor Lukasik or Lecky selectively enforced the overcrowding ordinance.

**III.    Conclusion**

All totaled, it appears that all defendants wanted to help the Hispanic population as opposed to discriminate against them.  None of their decisions were instructed by racial animus against Jupiter's Hispanic residents.  Accordingly, it is hereby,

ORDERED AND ADJUDGED that defendants' motions for summary judgment **[DE 173, 177]** are GRANTED.  Defendants' Motion in Limine **[DE 176]** is denied as moot.  Final judgment shall be entered by separate order.

DONE AND ORDERED in Chambers at West Palm Beach, Florida, this 8 day of August, 2009.

_\_\_/s/ Kenneth L. Ryskamp_____
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE

Copies provided:
All counsel of record